# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION



FILED
Scott L. Poff, Clerk
United States District Court

By tblanchard at 11:41 am, Nov 30, 2017

UNITED STATES OF AMERICA ) 
 ) 
v. ) CR417-056 
 ) 
JIMMIE ALEXANDER, ) 
 ) 
     Defendant. )

## REPORT AND RECOMMENDATION

Defendant Jimmie Alexander, indicted for possession of a firearm as a felon, seeks to suppress evidence seized during a warrantless search of his person. Doc. 14. The Court directed him to clarify the factual basis of his motion or withdraw it, and he complied. Docs. 23 (Order) & 25 (Amended Motion). The Government declined the opportunity to amend its opposition. Doc. 27. On November 1, 2017, the Court held a hearing on Alexander's motion.

## I. Background

Both parties rely on the facts reflected in Savannah-Chatham Metropolitan Police Department (SCMPD) reports and body camera footage. *See* doc. 25 at 1-4 (factual summary citing attached reports and body camera footage), 12 (stating that Alexander supplies the required

factual support by reference to reports and body camera footage); doc. 17 at 1 n. 1 (stating Government's expectation that evidence will show facts as reflected in attached police reports). At the hearing, the Government offered into evidence an additional body camera video recorded by Officer Justin Miller as well as Miller's testimony.[1] Alexander did not testify or offer any other evidence.

The encounter that ended with Alexander's arrest began innocuously. At approximately 2:00 a.m. on December 2, 2016, SCMPD officer Erik Kolwicz noticed a car sitting at an intersection in an area of Savannah where violent crime was prevalent.[2] Doc. 25-1 at 1, 4. It was in the right travel lane, but had its parking lights on. *Id.* at 4. Officer Kolwicz circled the block several times, but the parked car remained. *Id.* He stopped his own vehicle behind the car and sat for 3 to 4 minutes, while running the registration. *Id.* The occupants, a black female in the driver's seat and Alexander in the passenger's seat, appeared not to

---

[1]  Because that video had not been produced to defense counsel prior to the hearing, the Court granted him five days to review it and file any objection to its admission or any argument concerning its implications. *See* doc. 28. As defendant has filed no objection nor supplemented his motion, the Court considers the video in its analysis below.

[2]  Officer Miller testified that SCMPD officers respond to gunshots in that area on a "weekly, if not daily" basis.

notice him until he activated his "take-down lights" and spotlight. *Id*. (Miller testified that "take-down lights" refer to white lights mounted on a police vehicle's roof, used to provide general illumination and protect officers' safety by obscuring their approach.)

A second SCMPD officer, Justin Miller, arrived and approached the passenger side of the car as Officer Kolwicz approached the driver's side. *See* doc. 25-1 at 4; doc. 25-2 at 2. During a brief, polite conversation with the female in the driver's seat, Kolwicz indicated that he had noticed the driver and passenger "sitting . . . at this stop sign for a long period" and wondered whether they were "doing alright." *Id.*; doc. 25 at 2. He then asked if the vehicle occupants had any "ID." *Id*. As Alexander leaned toward the center of the car, Officer Miller observed the handle of a semi-automatic pistol tucked into Alexander's waistband. Doc. 25-2 at 3. Kolwicz's body camera records a glimpse of a signal from Miller, to which Kolwicz responds by first directing Alexander to step out of the car, and then, almost in the same breath, by commanding him to place his hands on the dashboard. Alexander put his hands on the dash as directed. Officer Miller then opened the car door and asked Alexander whether he

had a weapon on him.   Alexander said "No."[3]   *Id.*; *see also* doc. 25 at 3

(noting that when asked "to confirm that he's in possession of a firearm,"

Alexander denied it).   Miller repeated the question two more times,

receiving the same response from Alexander.   *Id.*   Miller drew his own

weapon (but did not point it at Alexander) and asked whether Alexander

had anything on him that *looked* like his own semi-automatic pistol.   *Id.*

---

[3]   The parties' disagree as to whether Alexander was ordered to place his hands on the dash before or after he denied that he was armed.   As discussed below, the parties agree that he was seized the moment he was ordered to put his hands on the dash. Alexander contends that if that seizure occurred *before* his denial, the only basis for the seizure would have been his possession of the gun.   Such possession alone, he argues, is insufficient to justify the seizure.

The video recordings are inconclusive as to the precise chronology.   The video from Kolwicz's body camera clearly shows that Officer Miller asked Alexander whether he was armed several times after his hands were on the dashboard.   Miller's report, however, states that Alexander was only ordered to place his hands on the dashboard after he denied being armed.   Doc. 25-3 at 3.   Miller testified that he did not open the car door before Alexander had denied that he possessed a gun.   The audio and video from Kolwicz's camera does not clearly capture all of the interactions between Miller and Alexander.   The video from Miller's body camera adds little. When it begins, the car door is already open.   Further, there is no audio for the first 30 seconds of the video, and when the audio begins Alexander has already been removed from the car.   Miller's hand also blocks the camera's view of Alexander.   It is impossible to discern, therefore, what occurs before Alexander is directed to place his hands on the dash.

Given the videos' ambiguity, and Miller's unambiguous and unrebutted report and testimony, the Court accepts that Alexander denied that he was armed *before* he was seized.   Nevertheless, as discussed below, the precise sequence of events is immaterial.   The officers were justifiably concerned for their safety the moment Miller saw that Alexander had a pistol stuffed in his waistband.   The order that he place his hands on the dash was a reasonable safety precaution under the totality of the circumstances.   The officers' legitimate safety concerns ripened into reasonable suspicion, if not probable cause, when Alexander lied about being armed.

4

Alexander shook his head. *Id.* After that denial, Miller retrieved the pistol from Alexander's waistband and placed it on the roof of the car. After disarming Alexander, Miller handcuffed him and placed him in the back of his vehicle. *Id.* He questioned Alexander about the gun and whether he had a permit to carry it. *Id.* Alexander replied that he "was on the first offender list and did not have a permit." *Id.*

Alexander and the Government agree that the officers' initial contact with the car's occupants did not implicate the Fourth Amendment. Doc. 17 at 2-3; doc. 25 at 8. Thus, the officers required no level of suspicion in order to approach the parked vehicle and ask its occupants some basic questions. *See, e.g., Muhler v. Mena*, 544 U.S. 93, 101 (2005) (quoting *Florida v. Bostick*, 501 U.S. 429, 434, 434-35 (1991)) ("We have 'held repeatedly that mere police questioning does not constitute a seizure,'" and "'[e]ven when officer have no basis for suspecting a particular individual, they may generally ask question of that individual; ask to examine the individual's identification; and request consent to search his or her'" belongings); *Terry v. Ohio*, 392 U.S. 1, 33 (1968) (White, J. concurring) ("There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the

streets."); *United States v. Espinosa-Guerra*, 805 F.2d 1502, 1506 (11th Cir. 1986) (citing *United States v. Berry*, 670 F.2d 583 (5th Cir. 1982) (en banc)) (noting that "police-citizen communications involving no coercion or detention" do "not implicate fourth amendment scrutiny."). Alexander does not contend that either occupant refused to answer the officers' questions or attempted to terminate the interaction and depart. *See* doc. 25 at 2-3.

Within seconds of the initial contact,[4] Miller observed what he immediately identified as a pistol on Alexander's person. When he confronted Alexander with that information, Alexander repeatedly denied having a gun. Doc. 25-3 at 3. Both parties agree that from the point Alexander was told to place his hands on the dash the encounter escalated from a purely consensual one to a seizure that implicated Alexander's Fourth Amendment rights. The Court must decide whether, under the circumstances presented, the officers acted unreasonably in issuing that command or in taking the further step of seizing the pistol and subjecting Alexander to an investigatory detention. Alexander contends that his

---

[4] Alexander's own recital of the facts indicates, and the video confirms, that the entire exchange from Kolwicz's initial approach of the driver to Miller's removal of the pistol took no more than 30 seconds. *See* doc. 25 at 2-3 (relying on time codes from Kolwicz's body camera footage).

"open" possession of a firearm was not a sufficient basis for reasonable suspicion and that the officers had no other reason to suspect him of criminal activity. *Id.* at 10-11. Nor, he argues, did he pose any threat to officer safety that warranted his seizure. *Id.* at 8.

## II.    Discussion

Alexander points out that Georgia residents are authorized to carry concealed weapons if they obtain the necessary permit under O.C.G.A. § 16-11-126, and he references a recent Georgia statute (enacted in 2014) that prohibits law enforcement officers from detaining a person who elects to exercise his gun-toting rights "'for the sole purpose of investigating whether such person has a weapons carry license.'" Doc. 25 at 4 (quoting O.C.G.A. § 16-11-137(b)). Because the officers in this case had no reasonable basis for suspecting that Alexander lacked such a permit, he argues that he presented no "particularized threat" to the officers (doc. 25 at 8) and, furthermore, that "officer safety even coupled with an encounter late at night in a high crime area (and more) is not a justification to detain a citizen not reasonably suspected of a crime." *Id.* at 10. He supports this position by relying on a decision from the Fourth Circuit, which states that the exercise of a state-conferred right to openly

carry firearms cannot, "without more," justify an investigatory detention. *United States v. Black,* 707 F.3d 531, 540 (4th Cir. 2013).

Alexander's argument is premised upon a mischaracterization of the facts of this case (for the initial seizure was not made "for the sole purpose" of determining whether he had a proper concealed weapons permit), a misreading of Fourth Circuit precedent (which has *rejected*, not adopted, the notion that the legality of a frisk for a concealed weapon depends upon the illegality of the firearm's possession), and a failure to recognize the difference between an investigatory stop (which requires a reasonable suspicion of criminality) and a protective frisk (which requires no suspicion of criminality at all, but only a reasonable fear that the person frisked poses a threat to officer safety). This amalgam of errors leads defendant inevitably to the wrong conclusion -- that because the officers were required by law to presume that the firearm stuffed in his waistband was being lawfully carried, they had no reasonable investigative or safety concern that justified even his temporary seizure. Doc. 25 at 10. As will be explained below, this argument is just plain wrong.

It bears repeating that it is only the legality of the police conduct

that ensued once Officer Miller spotted the firearm hidden in Alexander's waistband that is at issue here. Up to that point, as Alexander concedes, this was an ordinary police-citizen encounter not subject to the strictures of the Fourth Amendment. Doc. 25 at 8 (it was from the point that Alexander was ordered to place his hands on the dash that he would have recognized that he was not free to leave); *id.* at 11 (all evidence must be suppressed "from the moment when Mr. Alexander was ordered to place his hands on the dash"). Thus, the validity of the officers' initial approach of the parked car or their posing some friendly questions to its occupants is unchallenged.[5]

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that, even in the absence of probable cause, police may briefly detain an individual whom they reasonably suspect to be engaged in criminal activity and then frisk that person for weapons upon a reasonable suspicion that he is armed and dangerous. As in *Terry* itself, most such protective frisks grow out of an initial investigatory stop. It is well

---

[5] As Alexander correctly recognizes in his brief, police-citizen encounters involving no coercion "do not implicate the Fourth Amendment," and the police are free to "address[ ] questions to anyone on the streets." Doc. 25 at 5-6. Only when the police take such action as to give a reasonable person the impression that they are not free to terminate the encounter does a Fourth Amendment seizure occur. *Id.*

settled, however, that in some circumstances the police are authorized to conduct a *Terry* frisk of a person they encounter even where the officers have no investigatory interest in the person they frisk. As the Eleventh Circuit held in *United States v. Bonds*, 829 F.2d 1072 (11th Cir. 1987), *Terry* stops and *Terry* frisks are "separate activities which serve distinct purposes and require distinct justifications." *Id.* at 1074. Whereas "[a] stop is the result of an officer's focused investigation into a potential crime," "[a] frisk . . . does not always result from, nor is it necessarily a part of, any focused investigation of the individual." *Id.* "Rather, when an officer legitimately encounters an individual, *whether he is investigating that individual or not*, the officer may reasonably believe himself to be in danger and may wish to determine quickly whether that person is armed." *Id.* (emphasis added). "Thus, even when an officer encounters an individual that he does not suspect of any criminal activity whatsoever, the officer is entitled to frisk that individual for weapons if the officer reasonably believes the individual is armed and presently dangerous." *United States v. Williams*, 2011 WL 765728 at * 3 (S.D. Ga. Jan. 12, 2011) *report and recommendation adopted*, 2011 WL 892367 (S.D. Ga. Mar. 11, 2011), *aff'd*, 457 F. App'x 847 (11th Cir. 2012).

Here, the officers lawfully approached two individuals seated in a car that was parked on the street in an area of the city known for its high level of violent crime. It was late at night, and the officers knew that the vehicle had been stationary at an intersection for several minutes. After one of the officers (in a courteous manner) inquired whether the occupants were okay and asked to see some identification, the other officer spotted a gun tucked in the passenger's waistband. Almost immediately, the passenger was ordered to place his hands on the vehicle's dash.[6]

Did the spotting of the concealed pistol justify the officers' command under the circumstances? Clearly it did. Again and again, the Supreme Court has emphasized that even routine traffic stops "are especially fraught with danger to police officers," *Michigan v. Long*, 463 U.S. 1032, 1047 (1983), and that given the frequency with which officers are killed during such encounters, the public has a "legitimate and weighty" interest in officer safety in those circumstances. *Pennsylvania*

---

[6] Despite its earlier factual finding to the contrary, the Court will here use Alexander's version of the events, *i.e.*, that he was commanded to put his hands on the dash *before* he ever lied about having a gun. As will be explained, Alexander loses his argument whether his lie occurred before or after Officer Kolwicz' commanded him to put his hands on the dash.

*v. Mimms*, 434 U.S. 106, 110 (1977) (per curiam). "[T]he same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or a passenger." *Maryland v. Wilson*, 519 U.S. 408, 413 (1997). The substantial threat to officer safety, and the safety of all occupants of the vehicle, is minimized "'if the officers routinely exercise unquestioned command of the situation.'" *Id.* at 414 (citation omitted). Thus, officers may, without violating the Fourth Amendment, order both the driver and all passengers to get out of their vehicle, *Mimms*, 434 U.S. at 111 n. 6; *Wilson*, 519 U.S. at 410, or remain in the vehicle and keep their hands visible. *See United States v. Clark*, 337 F.3d 1282, 1288 (11th Cir. 2003); *see also United States v. Moorefield*, 111 F.3d 10, 13 (3d Cir. 1997) (during a routine traffic stop, officers did not offend the Fourth Amendment by ordering vehicle passenger to remain in his vehicle and keep his hands raised, for the safety benefits of this "minor intrusion" outweighed the passenger's right to personal security free from arbitrary police intrusion). While the foregoing principles were established by the Supreme Court in the context of routine traffic *stops*, the same safety concerns arise when an officer, late at night and in a high crime area, approaches an already stopped vehicle

to check on the well-being of the occupants. Even during such a consensual police-citizen encounter, the officer is exposed to a significant risk that someone in the vehicle is prone to violence and poses a threat to his personal safety.

An officer faces an "inordinate risk as he approaches a person seated in an automobile," even where he has no specific reason to suspect that person is dangerous. *Mimms*, 434 U.S. at 110; *Arizona v. Johnson*, 555 U.S. 323, 330 (2009). That inherent risk is "heightened exponentially" whenever the vehicle occupant is "'armed with a weapon that could unexpectedly and fatally be used against' the officer in a matter of seconds." *United States v. Robinson*, 846 F.3d 694, 699 (4th Cir. 2017) (quoting *Terry*, 392 U.S. at 23). Thus, once Officer Miller saw that the passenger of the approached vehicle had a semi-automatic pistol concealed in the waistband of his pants, it was reasonable and prudent for the officers to conclude that the armed passenger posed a significant danger not only to their safety but to the driver's safety as well. In response to that obvious risk, the officers did not immediately frisk Alexander, pull him from his vehicle, or engage in any other "severe . . . intrusion upon [his] cherished personal security." *Terry*, 392 U.S. at 25

(noting that "[e]ven a limited search of the outer clothing for weapons constitutes" such a severe intrusion). Instead, they simply ordered him to place his hands on the dash, a far more *de minimis* intrusion than a frisk or the use of any strong-arm tactics.[7] Only when Alexander denied possessing a firearm did the officers proceed with the more aggressive measures of seizing the weapon, removing him from the vehicle, and subjecting him to an investigative detention. Those additional, more intrusive measures were entirely justified, for Alexander's lie about the existence of the gun (that Officer Miller had already spotted) not only elevated the officers' safety concerns but also furnished the officers with reasonable suspicion to believe that Alexander's possession of that firearm was unlawful. *See Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("evasive behavior is [a] pertinent factor in determining reasonable suspicion"); *Georgia Carry Org., Inc. v. Kabler*, 580 F. App'x 695, 697-98 (11th Cir. 2014) (concluding that officers who observed individual enter a convenience store late at night, "a combination of time and place for which armed robberies are particularly problematic," and who attempted

---

[7] If such *de minimis* intrusions are allowed when the officer has no reason to believe that anyone in the vehicle is armed, and they are (see *supra* at 12), then they are certainly allowed when the officer *knows* that the vehicle occupant has a pistol concealed on his person.

to conceal his possession of a firearm, had reasonable suspicion "that his possession of the weapon was unlawful"); *United States v. Mosby*, 2015 WL 128189 at *3 n. 5 (S.D. Ga. Jan. 8, 2015) ("it is highly unlikely that a person not engaged in any wrongdoing would want to lie to the police."). Here, every step the officers took was consistent with the Fourth Amendment's reasonableness requirement.

Alexander gives considerable emphasis to a Fourth Circuit opinion that considered a North Carolina open-carry statute similar (in some respects) to Georgia's statute. The court reasoned that an individual's decision to exercise his state-conferred right to openly carry a firearm on his hip could not serve as a justification for his investigatory detention, for to hold otherwise "would eviscerate Fourth Amendment protections for lawfully armed individuals in those states." *Black*, 707 F.3d at 540. The court dismissed out of hand (but *without analysis*) the government's argument that it would be "'foolhardy' for . . . officers to 'go about their business while allowing a stranger in their midst to possess a firearm.'" *Id.* Using *Black* as his springboard, Alexander argues that the mere possibility that he had a concealed-carry license eliminated any safety concerns that the officers may have harbored. Doc. 25 at 10 (suggesting

that officer safety could not serve as a justification "to *detain* a citizen not reasonably suspected of a crime") (emphasis added). For multiple reasons, this argument does not persuade.

First, Alexander is factually mistaken in asserting that the officers initially subjected him to an "investigatory detention" or that their "sole purpose" was to determine if he had a proper gun license. As the above discussion makes clear, at the time the officers ordered him to place his hands on the dash their chief purpose was to prevent a vehicle passenger -- a person of unknown disposition and character, encountered late at night in a high crime area -- from pulling that weapon and shooting someone. Only after Alexander repeatedly lied about the existence of the gun did the officers conduct a *Terry* frisk for that weapon, or begin to question him about the legality of his gun possession. Second, not only does the panel decision in *Black* involve very different facts than presented here, that decision did not announce any general principle that an individual's lawful possession of a firearm can *never* create legitimate safety concerns on the part of a police officer sufficient to justify a *Terry* frisk. It simply held that the open, presumably lawful carrying of a firearm by one person could not, standing alone, serve as reasonable

suspicion to frisk an entire group of individuals who were peaceably conversing together in a public setting.[8]   *Black*, 707 F.3d at 535, 540.

While *Black* had nothing to say about the safety measures police officers may take when, during a lawful traffic stop, they have reason to believe that a vehicle passenger is packing a pistol, the Fourth Circuit specifically addressed that very circumstance in an *en banc* decision issued several years after *Black*.   In *United States v. Robinson*, 846 F.3d 694 (4th Cir. 2017), *cert. denied*, 2017 WL 2692399 (Oct. 30, 2017), police officers who stopped a vehicle for a seatbelt violation proceeded to frisk

---

[8]   In *Black*, a squad of officers (who had a hunch, but no reasonable suspicion, of criminal activity) decided to approach a group of six men who were "speaking and laughing" together in a parking lot located between two apartment complexes.   707 F.3d at 534.   As the officers drew close, one of the men (named Troupe) motioned to the officers that he was carrying a gun in a holster on his hip.   *Id.* at 535.   Despite a state statute that permitted the open carrying of a firearm, the officers seized the weapon and proceeded to frisk everyone in the group.   *Id.*   Before he was frisked, Black endeavored to walk away but was prevented from doing so.   *Id.* at 536.   In concluding that the government had patched together "a set of innocent, suspicion-free facts" which failed to establish reasonable suspicion for Black's investigatory detention, *id.* at 539, the court commented that the "lawful display of [a] lawfully possessed firearm" by one member of the group (Troupe) could not serve as a justification for *that person's* detention.   *Id.* at 540.   The Court then noted that "even if" the officers were justified in detaining Troupe because he was carrying a firearm, the reasonable suspicion that justified Troupe's detention was "not particularized as to Black, and we refuse to find reasonable suspicion merely by association."   *Id.* Thus, not only was the lawfulness of Troupe's detention not properly before the court (as he was not an appellant), the court made clear that its discussion about the legality of an investigatory detention of a gun-toting citizen in an open-carry state was *unnecessary* to the resolution of the issue presented by Black's appeal, *i.e.*, the lawfulness of *his* detention.   It is certainly arguable, therefore, that the *Black* panel's discussion of the firearms question is pure *dicta*.

17

the vehicle's passenger based upon their reasonable belief that he was armed. *Id.* at 695. That frisk was contested on the ground that, as far as the officers knew, the passenger had the necessary permit to carry the concealed weapon and there were no other articulable facts demonstrating that he was dangerous. *Id.* at 695-96. In a 12 to 4 decision, the court rejected that argument and concluded "that an officer who makes a lawful traffic stop and who has a reasonable suspicion that one of the automobile's occupants is armed may frisk that individual for the officer's protection and the safety of everyone on the scene." *Id.* at 696. The court deemed it "*inconsequential* that the passenger may have had a permit to carry the concealed firearm," *id.* (emphasis added), reasoning that an armed passenger poses the same risk to officer safety whether he possesses his weapon legally or illegally.

The *Robinson* court based its analysis upon the numerous Supreme Court decisions recognizing that armed individuals, including those encountered during a routine traffic stop, pose "'a serious and present danger to the safety of the officer.'" *Id.* at 700 (quoting *Mimms*, 434 U.S. at 112). In rejecting the argument that the legal possession of a firearm somehow eliminates that risk, the court stated: "The presumptive

lawfulness of an individual's gun possession in a particular State does next to nothing to negate the reasonable concern an officer has for his own safety when forcing an encounter with an individual who is armed with a gun and whose propensities are unknown." The *Robinson* court then concluded, "as a matter of law," that whenever during a lawful traffic stop an officer reasonably suspects that a vehicle occupant is armed, the officer is warranted in the belief that his safety is in danger and may proceed to frisk the individual and remove the weapon for his own safety. *Id.* at 701; *see id.* at 700 (noting that the Supreme Court had "deliberately linked 'armed' and 'dangerous' in both *Terry* and *Mimms*")

It is true that the roadside encounter in this case did not occur in the context of a "forced" traffic stop as in *Robinson*, but rather was a non-investigatory welfare check of the vehicle occupants. But the same risks are at play during such a roadside encounter as are presented during a routine stop of a vehicle for a minor traffic offense -- "'the fact that evidence of a more serious crime might be uncovered during the stop,'" thus prompting a violent response from the vehicle occupants. *Robinson*, 846 F.3d at 699 (citations omitted). *Every* roadside encounter of this nature -- be it to enforce the traffic laws or to check on the status

of the vehicle's occupants -- is "fraught with danger," and the observation of a gun tucked into a passenger's waistband so dramatically increases the officer's safety concerns as to justify the taking of reasonable protective measures. Therefore, ordering Alexander to place his hands on the dash as a means of allaying the officers' concerns for their safety and the safety of the driver was a perfectly legitimate precaution during this late-night encounter in a high crime area.

## III.  Conclusion

The Fourth Amendment does not "require . . . police officers [to] take unnecessary risks in the performance of their duties." *Terry*, 392 U.S. at 23. The notion -- advocated by Alexander here -- that these officers were required to ignore the gun tucked in his waistband, not ask him any questions about it, and not seize it when he denied its existence runs contrary to that overarching principle of Supreme Court jurisprudence. His motion to suppress is without merit and should be **DENIED**.[9]

This Report and Recommendation (R&R) is submitted to the district

---

[9]  Alexander's challenge to the admissibility of his post-seizure statements (as violative of *Miranda v. Arizona*, 384 U.S. 436 (1966)) is moot, as the government stipulated at the hearing that it would not use those statements at trial.

judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3. Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Report and Recommendations." Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonett v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED,** this 30th day of November, 2017.



UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

21